# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30877

United States Court of Appeals
Fifth Circuit

**FILED**
April 8, 2019

Lyle W. Cayce
Clerk

ROLAND A. ALONSO; RCS CONTRACTORS, INCORPORATED,

      Plaintiffs - Appellees

v.

WESTCOAST CORPORATION,

      Defendant - Appellant

Appeal from the United States District Court
for the Middle District of Louisiana

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

After a jury trial, Westcoast Corporation was found liable for breaching a contract it entered with RCS Contractors, Inc. Among Westcoast's claims of error are the finding of a bad-faith breach, the language of the verdict form, and the award of attorney fees. We conclude there was one error, which was the amount of a penalty determined under the Louisiana Prompt Payment Act. We VACATE and REMAND for further proceedings as to the penalty. As a result of that reversal, we also VACATE and REMAND the award of attorney fees for reconsideration of the amount after the statutory penalty is reconsidered. In all other respects, we AFFIRM.

No. 17-30877

## FACTUAL AND PROCEDURAL BACKGROUND

This dispute arises out of the Army Corps of Engineers' West Roosevelt Street Sewer Force Main Relocation Project in Baton Rouge, Louisiana (the "project"). The Corps contracted with Garner, who is not a party to this suit. Garner in turn subcontracted the work to Westcoast, who then entered a subcontract with RCS. RCS was to "provide all labor, material, special equipment and supervision required to install and complete" the project according to the specifications provided by the Corps, and it was to be paid $496,450. The parties expected the subcontract to be completed in 120 days.

RCS began work in September 2010. Several interruptions slowed completion and increased the cost of the project. Several change orders documented increases in the subcontract price, which were primarily based on unanticipated costs.

The first interruption began when it was discovered that certain existing physical joints on the sewer system would need to be bypassed and relocated. Work was put on hold in March 2011 pending a full redesign. Even after completion of the redesign, work could not be resumed until September 2011, when the flood stage of the Mississippi River fell to a safe level. The second period of interruption began in December 2011 and continued until January 2012 while a solution was developed to correct for leaking pipes.

RCS stopped its work on the project in July 2012 without completing its final "punch list" work. In August 2013, RCS and its president, Roland Alonso, filed suit against Westcoast in the Middle District of Louisiana, claiming that Westcoast failed to submit change orders promptly, which prevented RCS from being compensated for the additional work it had performed on the project, and that Westcoast also failed to make prompt payments to RCS under the change orders it did submit. We will refer to the plaintiffs jointly as "RCS."

2

No. 17-30877

After a jury trial and post-hearing motions, the district court entered an amended final judgment.  It awarded the plaintiffs $304,189 on the claim of a bad faith breach of contract, $66,450 under the state Prompt Payment Act, $130,517.60 in attorney fees, and $400 in costs.

## DISCUSSION

The ruling by the district court from which this appeal was taken was Westcoast's renewed motion for a judgment as a matter of law ("JMOL").  "We review *de novo* the district court's denial of a motion for judgment as a matter of law, applying the same standard as the district court."  *International Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).  A JMOL is appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving party] on that issue."  FED. R. CIV. P. 50(a).  "In resolving such challenges, we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party."  *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008).

The jury's "verdict should be affirmed 'unless the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'"  *EEOC v. EmCare, Inc.*, 857 F.3d 678, 683 (5th Cir. 2017) (citation omitted).

Westcoast raises four issues, which we will discuss in the following order:

I. Did the district court correctly enter judgment confirming the jury's verdict in favor of RCS on its bad faith breach of contract claim?

II. Did the district court correctly decide not to ask on the verdict form whether RCS substantially breached the subcontract?

III. Did the district court correctly grant judgment to RCS on their claim for a penalty payment under the Louisiana Prompt Payment Act?

No. 17-30877

IV. Did the district court correctly grant attorney fees to RCS under the Prompt Payment Act?

*I. Bad Faith Breach of Contract by Westcoast*

Westcoast makes three arguments to support its claim that the district court erred in entering judgment on RCS's claim of a bad faith breach of contract:  (A) RCS substantially breached the subcontract, and this constitutes an affirmative defense under Louisiana law; (B) the language of the subcontract specifically prohibits the assessment of delay damages; (C) it was entitled to back-charge RCS for the cost of flagmen fees and liquidated damages, because the subcontract assigned the cost of acquiring the flagmen to RCS and Westcoast was left to complete the work RCS left unfinished.  We address each argument.

*(A) Substantial Breach*

Under Louisiana law, "one party's substantial breach, which would preclude his enforcement of the contract, is an affirmative defense that may be asserted by the other party."  *LAD Servs. of La., L.L.C. v. Superior Derrick Servs., L.L.C.*, 167 So. 3d 746, 756 (La. Ct. App. 2014).  Westcoast alleges that it presented "uncontroverted evidence" at trial that RCS substantially breached the subcontract, which it maintains supported an affirmative defense for its own breach.  Specifically, Westcoast alleges that RCS's failure "to provide the as-built drawings, lien waivers, and certifications" as required under the subcontract constituted substantial breach.  Westcoast relies on the testimony of Dr. Jerry Householder, an expert for RCS, to show that the president of RCS "abandoned the job" and "breached the contract by not providing final lien waivers."

4

No. 17-30877

RCS responds with both a procedural and a substantive argument. First, it contends Westcoast waived any potential affirmative defense arising out of RCS's own breach because Westcoast never presented this argument to the district court. The principal failure is said to be in Westcoast's motion for JMOL, which challenged only the jury finding that Westcoast breached the subcontract. It did not argue that evidence of RCS's breach of the subcontract required a verdict in Westcoast's favor. Second, Westcoast's argument is said to fail on the merits because the evidence at trial was insufficient to establish as a matter of law that RCS substantially and materially breached the subcontract prior to Westcoast's breach.

RCS is correct that Westcoast waived[1] any affirmative defense it might have had. If a party fails to move for JMOL under Rule 50(a) after all the evidence has been presented, then "that party waives both its right to file a renewed post-verdict Rule 50(b) motion and also its right to challenge the sufficiency of the evidence on that issue on appeal." *Flowers v. S. Reg'l Physician Servs. Inc.*, 247 F.3d 229, 238 (5th Cir. 2001). Westcoast did not move for JMOL under Rule 50(a) on the theory that RCS substantially breached the contract and thus excused Westcoast from its duties under the subcontract.

Though the issue was waived, we consider an issue raised for the first time on appeal for plain error, which requires proof that: "(1) there was error;

---

[1] We accept the validity of the point made in an at least one of our precedents that the word "forfeit," not "waive," is the correct label for a "failure to make the timely assertion of a right" that does not completely foreclose appellate review. *NewCSI, Inc. v. Staffing 360 Sols., Inc.*, 865 F.3d 251, 259 n.7 (5th Cir. 2017) (citation omitted). "Waiver," on the other hand, is an "intentional relinquishment of a known right, and extinguishes an error completely." *Id.* (citation omitted). The linguistic battle will need to be waged elsewhere, as this opinion uses the word "waiver" to avoid any unintended distinction from the precedents we are quoting which do the same.

(2) the error was clear and obvious; (3) the error affected [the appellant's] substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *SEC v. Life Partners Holdings, Inc.*, 854 F.3d 765, 783 (5th Cir. 2017).

To succeed on its claim that RCS's breach justified its own undisputed breach, Westcoast was required to prove that RCS's breaches were substantial. *See LAD Servs. of La.*, 167 So. 3d at 756-57. A breach is substantial if it is an actual cause of the other party's "failure to comply with its obligations." *Id.* at 756. We have held that a jury's finding of breach was not supported by sufficient evidence where "the record on appeal reveal[ed] overwhelming, undisputed evidence that [the other party to the contract] repeatedly and substantially breached the contract prior to the termination." *Olympic Ins. Co. v. H. D. Harrison, Inc.*, 463 F.2d 1049, 1050 (5th Cir. 1972). Absent similar uncontradicted evidence establishing that RCS substantially breached the subcontract, this court cannot disturb the jury's verdict.

The alleged breach by RCS included failing to complete clean-up and close-out projects such as a failure to provide final lien waivers and certifications, failure to turn over the as-built drawings, and failure to complete the "punch list" of final tasks. RCS contends that these breaches occurred well after Westcoast had already breached the subcontract, and thus RCS's breach could not have been the actual cause for Westcoast's breach.

Alonso testified that Westcoast breached the contract by: not obtaining change orders, not providing workable plan specifications, and not providing access to the Corps. Alonso also testified that Westcoast falsely informed him in writing that the change orders were approved and told RCS to resume work on the project when the Corps had not yet approved the change orders. He testified he had no choice but to finish the job because otherwise "raw sewage

No. 17-30877

would be on the street." The jury also heard testimony that RCS refused to do additional work "because of the lack of payment." Thus, a reasonable jury could conclude that Westcoast's breaches were substantial and RCS had no substantial breach because Westcoast's breaches caused RCS's refusal to complete the final duties of the subcontract.

We find no clear and obvious error, and thus no plain error, to undermine the jury's implicit finding that RCS's breach was not substantial.

*(B) Delay Damages*

Westcoast contends that the subcontract prohibited any claims associated with delay damages, citing this provision:

> If the Subcontractor is delayed in the prosecution of its Work due to the acts of the Owner and/or its agents and the Subcontractor suffers delay damages there from, the Contractor agrees to transmit to the Owner any claims submitted to it by the Subcontractor. . . . It is agreed that in no event will the Contractor be liable for Subcontractor's claims for delay.

Westcoast contends that there was "uncontroverted evidence" at trial that it promptly transmitted any claims from RCS to the contractor Garner, and that Garner transmitted those claims to the Corps. Thus both contractually and factually, it argues the jury award of $304,189 for bad faith breach of contract must have included "delay damages," and such damages are impermissible.

RCS responds that the subcontract provision barring delay damages is not enforceable under Louisiana law because of the jury finding that Westcoast breached in bad faith. Such a finding amounts to intentional or gross fault. Louisiana law provides that any "clause is null that, in advance, excludes or limits the liability of one party for intentional or gross fault that causes damage to the other party." LA. CIV. CODE ANN. Art. 2004. The term "gross fault" in

7

that provision "encompasses not only gross negligence, but also bad faith breach of contract or fraud." *Wadick v. Gen. Heating & Air Conditioning, LLC*, 145 So. 3d 586, 599 (La. Ct. App. 2014).

The jury instructions, for which no error on this point is alleged on appeal, provided that "[b]ad faith generally implies actual or constructive fraud or refusal to fulfill contractual obligations, not an honest mistake as to the actual rights or duties." Additionally, the jury was instructed to weigh the credibility of the witnesses and "to interpret the contract between these two parties." "It is not the role of this court to second-guess jurors, so long as there was a legally sufficient evidentiary basis for their verdict." *Goodner v. Hyundai Motor Co.*, 650 F.3d 1034, 1045 (5th Cir. 2011).

There was sufficient evidence from which the jury could reasonably conclude that Westcoast breached the contract in bad faith. Therefore, the provision of the subcontract barring delay damages was unenforceable under Louisiana law. *See* LA. CIV. CODE ANN. art. 2004. Westcoast's motion for JMOL on this issue was correctly denied.

### (C) Flaggers and Liquidated Damages

Third, Westcoast argues that the damage award on RCS's bad faith breach of contract claim should have been reduced to reflect the cost of "flaggers" and also for other liquidated damages Westcoast incurred for which it asserts RCS is responsible.

As to flaggers, they were needed because a portion of the project took place near a railroad track. The evidence supports that the parties understood when negotiating the subcontract that it would at times be necessary to hire railroad flaggers. The parties dispute who was required to pay for them.

No. 17-30877

Westcoast relies on the language of the subcontract, which states that all "cost and coordination for railroad [flaggers] shall be the responsibility of the Subcontractor as specified as required." Based on this language, Westcoast argues it is entitled to a return of the $84,000 it paid to hire flaggers.

RCS counters that this subcontract provision was subsequently modified by oral agreement and course of conduct between the parties. To support that there was an amendment to the contract, RCS was required to "prove by a preponderance of the evidence facts or acts giving rise to the modification." *Driver Pipeline Co. v. Cadeville Gas Storage, LLC*, 150 So. 3d 492, 501 (La. Ct. App. 2014). We will affirm the jury's verdict "unless 'there is *no* legally sufficient evidentiary basis' for the jury's verdict." *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439, 445 (5th Cir. 2001) (quoting FED. R. CIV. P. 50(a)(1)). There is a legally sufficient evidentiary basis for the jury's verdict unless "the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not arrive at a contrary verdict." *Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 855 (5th Cir. 2010).

Louisiana caselaw provides that a "written construction contract may be modified by oral agreement and by the conduct of the parties, even when the contract provides that change orders must be in writing." *Driver Pipeline*, 150 So. 3d at 500. The written contract can be modified through "silence, inaction, or implication" and whether it was modified "is a question of fact." *Id.* at 501.

Evidence supporting a modification is as follows. Alonso testified that in order to pay for the flaggers, RCS would be required to carry railroad insurance. Nevertheless, the subcontract bidding allocated no funds to pay for such insurance. Indeed, counsel for Westcoast stated at oral argument before this court that his client "grabbed the railroad insurance because [Westcoast could] charge a premium to the federal government for it." Alonso also testified

at trial that his original quote for the project included the cost of coordination of the flaggers, but that an employee for Westcoast's parent company who reviewed RCS's initial bid on the project told him "to delete that item" because RCS was not "going to handle the flagging."

RCS also contends that the "conduct of the parties during construction clearly demonstrated that [flagger] coordination and costs fell under Westcoast's scope of work and was not passed down to RCS." Alonso testified that Francisco Galvan initially scheduled the flaggers on behalf of Westcoast. RCS began consulting with Galvan on flaggers coordination only after RCS's work was halted because no flagger was present on a certain day. Testimony from Thomas Schutt, Westcoast's general counsel, confirmed that Westcoast did all the coordination for the flaggers. Both Alonso and Schutt testified that Westcoast did not invoice RCS for the costs of the flaggers until months after RCS stopped working on the project. Taken together, this testimony supports the jury's finding that the parties modified their agreement regarding who was responsible for coordinating and paying the cost of the flaggers.

There is undisputed evidence that (1) the railroad insurance was removed from the contract; (2) RCS did not have railroad insurance, and that it could not hire flaggers without railroad insurance; and (3) Westcoast modified the flaggers provision of the subcontract by its coordination and financing of the flaggers. We conclude that "the facts and inferences" do not point so strongly and overwhelmingly in Westcoast's favor that they compel this court to overturn the jury's verdict. Thus, there is sufficient evidence to support the jury's finding that the flaggers were Westcoast's responsibility.

As to liquidated damages, Westcoast argues that RCS delayed the completion of the project by 111 days, which resulted in $107,779 in damages. RCS argued it would only be liable for damages related to the delay in

No. 17-30877

completion of the project if it was responsible for the delay. Michael Meredith, Westcoast's project manager, agreed that Westcoast would not be entitled these damages unless RCS was responsible for the delays. RCS's own expert, Dr. Householder, testified there was no record explanation for why RCS did not show up on certain days. Still, Dr. Householder answered in the negative when asked on the stand whether "RCS was responsible for any of the delays on this project." He further testified that it was not accurate to say that RCS was responsible for any delays. Instead, any claim from Westcoast for liquidated damages because of delays on the project was "in bad faith." Here, too, there is sufficient evidence to support the jury's finding as to the liquidated damages.

The district court correctly denied Westcoast's motion for JMOL on RCS's claim for bad faith breach of contract.

*II. Jury Verdict Form*

Westcoast alleges the district court erred in failing to ask on the verdict form whether RCS substantially breached the subcontract. This issue is related to the question of whether the district court erred in granting judgment to RCS on its breach of contract claim. Our resolution to that question is relevant to the effect any error might have had, but it does not answer the question of whether any error occurred in the first place.

Westcoast did not object to the absence of a question about substantial breach at trial, and so we review for plain error. Again, to obtain relief under plain error review, an appellant must show "(1) there was error; (2) the error was clear and obvious; (3) the error affected [the appellant's] substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Life Partner Holdings*, 854 F.3d at 783.

11

No. 17-30877

This court in its discretion may grant relief if the appellant makes this showing. *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 506 (5th Cir. 2012).

Westcoast argues it was plain error for the district court not to include a question on the verdict form asking if RCS had substantially breached the subcontract. It asserts that this error "could hardly be more clear and obvious" because it "effectively prevented the jury from reaching a verdict that is consistent with Louisiana law." That argument is based on "the principle that where one party substantially breaches a contract the other party to it has a defense and an excuse for non-performance." *Olympic Ins.*, 463 F.2d at 1053.

RCS counters that, even if the absence of an instruction about substantial breach was error, the error did not affect Westcoast's substantial rights because the jury was instructed that it could not hold Westcoast liable if RCS had substantially breached as well. RCS is referring to the instruction that if "one party to a contract substantially breaches the contract, then the breaching party cannot enforce the contract it has breached or demand damages from the other party to the contract." Accordingly, RCS contends that the jury was properly instructed and had to decide if RCS substantially breached the contract before it could decide if Westcoast was liable for the breach of contract.

In one of our precedents, the appellant alleged that a question on the verdict form "conflat[ed] the question of license (an affirmative defense on which [appellee] bore the burden of proof) with that of infringement (a claim on which [appellant] carried the burden)." *Baisden*, 693 F.3d at 506. Although we acknowledged that the jury question was "not a model of clarity," we held that "the mere fact that issues of liability and affirmative defense were combined into a single question is not grounds for a new trial." *Id.* The appellant also had failed to show his substantial rights were affected because

12

the district court correctly instructed the jury and no evidence suggested the jury did not follow those instructions. *Id.* at 507. We concluded there was no plain error in a question on the verdict form that combined liability and an affirmative defense. *Id.*

*Baisden* controls the outcome here. Combining the issues of liability and an affirmative defense into a single question on the verdict form did not constitute plain error.

### III. *Louisiana Prompt Payment Act*

The Louisiana Prompt Payment Act provides, if a "subcontractor without reasonable cause fails to make any payment to his subcontractors and suppliers within fourteen consecutive days of the receipt of payment from the owner . . . [the] subcontractor shall pay to the subcontractors and suppliers, in addition to the payment, a penalty." LA. STAT. ANN. § 9:2784(C). The Act further provides that the penalty shall be "one-half of one percent of the amount due, per day, from the expiration of the period allowed herein for payment after the receipt of payment from the owner. The total penalty shall not exceed fifteen percent of the outstanding balance due." *Id.* "[N]othing in the text of § 9:2784(C) suggests any opportunity for relief where the contractor has not received payment from the owner." *United States ex rel. Cal's A/C & Elec. v. Famous Constr. Corp.*, 220 F.3d 326, 330 (5th Cir. 2000).

After being properly instructed that the "total penalty shall not exceed 15 percent of the outstanding balance due," the jury awarded $66,450 to RCS on its claim under the Louisiana Prompt Payment Act.

The question on appeal is whether this award is supported by the evidence presented to the jury. RCS alleges that it is but fails to identify specific late payments sufficient to support the full $66,450 award. Westcoast

claims that it is not but concedes that there is evidence to support an award of $19,053.88.

The relevant evidence here primarily consists of change orders eight through eleven. These change orders were drafted by Westcoast. Each one documented a change in the total amount due to RCS under the terms of the subcontract. Change order eight increased the subcontract total to compensate RCS for additional costs incurred during the redesign of the project. Change order nine increased the total amount due under the subcontract to $1,013,026.85 to compensate RCS for additional costs incurred during the second period of disruption and to compensate RCS for "two days of railroad flagging." Change order ten reduced the total value of the subcontract by $84,625 as a back-charge for the cost of all railroad flaggers. Change order eleven further reduced the total value of the subcontract by $107,779.99 to account for extended overhead charges as a back-charge "due to work performed in the field extending past contractual completion." This final change order pegged the total value of the subcontract at $820,621.86.

Also relevant is evidence of payments Westcoast has already made to RCS. Determination of an appropriate penalty under the Act depends in large part on a determination of how much, if anything, Westcoast still owes RCS. The parties agree that RCS received a total of $693,596 from Westcoast before it ceased work on the project in March 2012. RCS does not claim that the late payment penalty applies to any part of those funds it received before March 2012. Finally, the parties agree that Westcoast paid RCS $127,025.86 in October 2015 and $12,529.73 in August 2016.

Westcoast argues its payments of $693,596 and $127,025.86 are evidence that it paid the full $820,621.86 owed to RCS according to the calculation of

the total value of the subcontract set forth in change order eleven.[2]  Westcoast argues that the maximum penalty possibly owed to RCS under the Act would therefore be $19,053.88 – a fifteen percent penalty on its October 2015 payment.

RCS argues that, because it was not responsible for the cost of the flaggers or extended overhead charges, the correct measure of the value of the subcontract is the total set forth in change order nine:  $1,013,026.85.[3] Because we have upheld RCS's argument that it should not have been back-charged for the cost of the flaggers or the extended overhead charges, Westcoast could properly be subject to a penalty on $319,430.85, the difference between the $1,013,026.85 Westcoast owed RCS and the $693,596 it promptly paid.  Applying the fifteen percent cap to this total, the maximum penalty would therefore be $47,914.63.

We have tried to discern the means by which the jury calculated the $66,450 penalty.  Mathematically, it almost works to start with the jury's award of $304,189 in damages for Westcoast's breach of contract.  The jury might have included this amount in its calculation of the penalty owed to RCS under the Act because it (1) represented payments the jury determined RCS should have received from Westcoast but did not; and (2) would be remitted more than fourteen days after Westcoast received payment from Garner.  If the jury started with that figure, then added the October 2015 payment of $127,025.86 and the additional payment of $12,529.73 that Westcoast made in

---

[2] Westcoast explains that its even later payment of $12,529.73 made in August 2016 reflected $3,679.73 in payment RCS should have received under change order three, and a $8,850 back-charge for the costs of flaggers for which RCS was inadvertently assessed twice.

[3] Significantly, Westcoast received full payment from Garner for the work described in change order nine; Westcoast had received a total of $1.44 million from Garner by March 2013.

August 2016, it would have found that Westcoast failed to make prompt payment of $443,744.59.  Applying the fifteen percent cap to that total results in a penalty under the Act of $66,561.69, which is about $100 more than jurors awarded.  Of course, this may not have been the jury's calculation.

The jury's use of its own award as the starting place for its calculation of a penalty under the Act would be unsupportable.  That calculation of damages includes costs that Westcoast never passed along to Garner.  To reiterate, a late penalty is due under the Louisiana Prompt Payment Act only for those sums a contractor receives but fails to pay to its subcontractors and suppliers within fourteen days.  No late penalty would be owed on amounts Garner never dispersed to Westcoast.  Jurors had to decide the penalty based on evidence of payments Westcoast received from Garner for work RCS completed but which Westcoast failed to pay to RCS within fourteen days.  Whatever path the jury followed to calculate the award, we cannot identify an amount of late payments large enough to sustain the penalty.

"There is a strong presumption in favor of affirming a jury award of damages. . . . However, when this court is left with the perception that the verdict is clearly excessive, deference must be abandoned."  *Eiland v. Westinghouse Elec. Corp.*, 58 F.3d 176, 183 (5th Cir. 1995).  In diversity cases, federal courts must apply the new trial and remittitur standard of the forum in which it sits.  *Fair v. Allen*, 669 F.3d 601, 604 (5th Cir. 2012).  Louisiana law gives courts the discretion to grant a new trial "in any case if there is good ground therefor, except as otherwise provided by law."  LA. CODE CIV. PROC. ANN. art. 1973.  There is a basis for a new trial here, where the jury awarded damages exceeding those permitted under the clear language of the Prompt Payment Act.  We remand to the district court for  new trial on damages under the Prompt Payment Act.

16

No. 17-30877

*IV.  Attorney Fees Under the Louisiana Prompt Payment Act*

The district court's decision to grant or deny attorney fees is reviewed for abuse of discretion; factual findings are reviewed for clear error.  *McClain v. Lufkin Indus., Inc.*, 519 F.3d 264, 284 (5th Cir. 2008).  "Under Louisiana law, attorney's fees ordinarily are not recoverable unless specifically authorized by statute or contract."  *Hollybrook Cottonseed Processing, LLC v. Am. Guarantee & Liab. Ins. Co.*, 772 F.3d 1031, 1036 (5th Cir. 2014).  The Louisiana Prompt Payment Act specifically authorizes attorney fees.  Under the Act, a "subcontractor shall be liable for reasonable attorney fees for the collection of the payments due to the subcontractors and suppliers."  LA. STAT. ANN. § 9:2784(C).

There is no challenge on appeal as to the factual findings supporting the calculation of the attorney fees award.  The only dispute is whether attorney fees should be granted for work completed up through trial.  Westcoast argues that RCS's award for attorney fees should be limited to fees earned for recovering the $127,025.86 payment, the only late payment it acknowledges.  Since the payment for $127,025.86 was made in October 2015, Westcoast contends that the award for attorney fees should not reflect any hours worked after that date.  RCS responds that it is entitled to attorney fees through trial because it did not receive its last payment under the Louisiana Prompt Payment Act until that time.

We agree that RCS was entitled to damages under the Louisiana Prompt Payment Act, albeit not the full $66,450 awarded by the jury.  Because RCS's monetary recovery will be revised, it also is necessary that attorney fees be reconsidered in light of that change.

17

No. 17-30877

## CONCLUSION

The award of damages under the Louisiana Prompt Payment Act was excessive.  We vacate the award of the late payment penalty and remand to the district court for a new trial on damages under the Prompt Payment Act.  We also vacate and remand to the district court the specific award of attorney fees under the Act for recalculation in light of our remand regarding the late payment penalty.  We affirm the judgment in all other respects.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.